UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

ROBERT BROTHERSON, et al.,

      Plaintiffs,

    v.

THE PROFESSIONAL BASKETBALL
CLUB, L.L.C.,

      Defendant.

CASE NO. C07-1787RAJ

ORDER

## I.  INTRODUCTION

There are nine motions pending.  In three of them (Dkt. ## 80, 87, 122), Defendant The Professional Basketball Club ("PBC") seeks summary judgment on one or more of Plaintiffs' claims.  In two (Dkt. ## 125, 126), Plaintiffs request partial summary judgment establishing PBC's liability.  Plaintiffs also filed motions to certify a class and subclass (Dkt. ## 33, 41), and two motions (Dkt. ## 98, 106) to seal documents.  Plaintiffs asked for oral argument on the class certification motions.  No party requested oral argument on any other motion.  In this order, the court rules only on the summary judgment motions and motions to seal, and reserves ruling on class certification pending further briefing.

## II.  BACKGROUND

PBC owns the NBA basketball team formerly known as the Seattle Supersonics (the "Sonics"), now known as the Oklahoma City Thunder.  The Sonics played their

ORDER – 1

home games in Seattle from 1967 through 2008, and at Seattle's Key Arena from 1995 to 2008. The Thunder, who first took the court in autumn 2008, play their home games in Oklahoma City's Ford Center.

PBC purchased the Sonics in July 2006. Given the well-publicized complaints of the previous ownership group, the manner in which the team was sold, and that PBC's principals are all Oklahomans, there was immediate concern, broadly reported in Seattle media, that PBC might not keep the team in Seattle. Tondini Decl. (Dkt. # 45), Exs. 1-7. Those concerns had not disappeared by the end of the 2007 season.[1] In mid-April 2007, in the wake of the death of a proposal in the Washington legislature to provide hundreds of millions of taxpayer dollars to finance a new arena for the Sonics, the Seattle Times reported that PBC Chairman Clayton Bennett would consider relocating the Sonics before the expiration of PBC's Key Arena lease in 2010. Griffin Decl. (Dkt. # 34), Ex. G. Mr. Bennett had not yet "completely given up hope" on keeping the team in Washington, but would "evaluate all of [PBC's] options," including breaking the Key Arena lease. *Id.* In the months that followed, more news articles cast doubt on whether the Sonics would remain in Seattle. Tondini Decl. (Dkt. # 45), Exs. 8-15. Nonetheless, the Sonics were set to play the 2008 season at Key Arena.

Concerned that uncertainty over the team's future would hurt ticket sales, PBC created and promoted the "Emerald Club," a set of benefits extending only to 2007 season ticket holders (excluding those with courtside seats) who renewed their tickets for the 2008 season. PBC described the Emerald Club in several publications, most notably in a brochure ("Brochure") mailed to 2007 season ticket holders. Tondini Decl. (Dkt. # 105), Ex. 2.

The Emerald Club Brochure plays a key role in the resolution of the parties' claims, and the court describes it in detail here. The Brochure describes itself at the

---

[1] The NBA regular season stretches from fall to spring. For simplicity, the court will identify seasons solely by the year in which they end. The "2007 season," for example, began in 2006 and ended in 2007.

ORDER – 2

outset as an "unprecedented offer" to "Sonics Season Ticket Holders." *Id.* at PBC_CA_10073. That unprecedented offer was described as an "unprecedented commitment" to provide "three-year cost certainty through the 2009-10 season." *Id.* at PBC_CA_10077. The same page provided additional details:

- Renew your season tickets and earn guaranteed cost certainty through 2009-10.

- By renewing your account with a 10% non-refundable deposit by Wednesday, April 25, 2007, your account will be established at 2006-2007 prices. Provided you maintain an active full-season account in good standing through the 2009-10 season, you will receive 2006-07 pricing. If you choose to change seat locations or upgrade your seat status you will pay the 2006-07 price for those seats.

- There will be a price increase for new season ticket accounts – but your membership in the exclusive Emerald Club will always differentiate your account status and provide you with price assurance.

*Id.* The next page gave instructions for renewing season tickets by phone, mail, or via the team's internet site. *Id.* at PBC_CA_100078. It also gave installment payment options. The Brochure noted that season ticket holders could "sell [their] tickets online via the Sonics Ticket Marketplace." *Id.* at PBC_CA_100080. The Brochure again touted "cost certainty through the 2009-10 season" as one of the "big savings" available to Emerald Club members. *Id.* at PBC_CA_100081. The rest of the Brochure described fringe benefits (including food and beverage promotions and exclusive season ticket holder events) and tips for "using your Sonics tickets effectively." *Id.* at PBC_CA_100082-86. It is not clear whether these additional benefits were available to all season ticket holders or only to Emerald Club members.

The Brochure also prominently acknowledged, in a full-page "message" from Mr. Bennett to 2007 season ticket holders, the "uncertainty of the Sonics' future beyond 2010." *Id.* at PBC_CA_100076. Mr. Bennett's message specifically mentioned

ORDER – 3

uncertainty about whether PBC would reach an agreement with state and local government to finance a new arena. *Id.* It also acknowledged, if only implicitly, that PBC's lease for Key Arena was set to expire in 2010. *Id.* Nonetheless, Mr. Bennett boasted that PBC was "absolutely committed to keeping the Sonics in the region, and we continue to be optimistic that we will secure the support we need to do just that." *Id.* Nowhere in the Brochure did PBC suggest that the Sonics might play home games at a location other than Key Arena before the 2011 season. Mr. Bennett also touted the benefits of the Emerald Club:

> At a time when we are asking you for your season ticket renewal, it is of paramount importance that we establish our commitment to you, our most passionate and supportive fan. Therefore, we are creating the Sonics Emerald Club, an exclusive membership for current Season Ticket Holders. Sonics Emerald Club member will earn long-term price assurances, enhanced amenities and priority activation related to the new arena.

*Id.*

The evidence shows that PBC deliberately declined to acknowledge the possibility of relocation before 2010 in the Emerald Club Brochure or any other communication sent to potential Emerald Club members. Bryan Byrnes, the Senior Vice President of sales and marketing for PBC in charge of 2008 season ticket sales, testified extensively that the Emerald Club campaign was intended to communicate that the Sonics would remain in Seattle through the 2010 season. When he pitched the Emerald Club to PBC executives, he noted that it provided an "opportunity to project long-term confidence of being in this [Seattle] market." Schoepflin Decl. (Dkt. # 99), Ex. B (Byrnes Depo. at 20). The Emerald Club offer communicated that the Sonics would continue to play in Seattle at least through 2010. *Id.* at 49 ("[O]ur correspondence to season ticket holders was that we would be continuing to play in Seattle and working toward a new arena in the Puget Sound Region."). Even after it became apparent that no financing arrangement for a new arena was forthcoming, and PBC might relocate the team before 2010, PBC declined to

ORDER – 4

add a disclaimer to its Emerald Club offer. *Id.* at 93 ("[Ticket sellers] were not instructed to do that. . . . we didn't believe [as of December 2007] anything other than we were going to be in Seattle."); *id.* at 95 ("We always believed that we would be in Seattle. And so there's no reason for [a ticket seller] to designate [in communications with ticket holders] that [the team might leave], specifically, because she wouldn't know otherwise."). Whatever uncertainty surrounded the team, PBC marketed the Emerald Club to "move forward with business models and business practices to promote and sell the team in a go-forward basis in Seattle." *Id.* at 101. Even when Mr. Bennett learned that the NBA itself was concerned with PBC's "messaging relative to renewals," PBC made no change to the Emerald Club terms. *Id.* at 84 & Ex. 13 (Apr. 16, 2007 Bennett e-mail). Until the end of June 2008, Mr. Byrnes "stay[ed] engaged on Seattle," consistent with his understanding of his obligation to PBC. *Id.* at 105. His "directive" from PBC management was "to move forward as if we were in Seattle." *Id.* at 108. Mr. Byrnes summed it up aptly: "The uncertainty was a given . . . . Our perspective was to address that with a business model, go forward in Seattle." *Id.* at 130.

In contrast to its assurances in the Brochure, PBC took actions that culminated in the team leaving for Oklahoma in summer 2008. On September 21, 2007, PBC filed an arbitration claim against the City of Seattle to terminate its Key Arena lease. The City moved the dispute to court. The Sonics played what would be their final Key Arena home game on April 13, 2008. In July 2008, after the close of evidence in a June 2008 bench trial before the Honorable Marsha J. Pechman of this District, but before Judge Pechman's decision, the City and PBC settled their dispute. The City released PBC from the Key Arena lease. The Sonics moved to Oklahoma City shortly thereafter.

There are three Plaintiffs in this action, each of whom was a 2007 season ticket holder who renewed his or her tickets for the 2008 season and became a member of the

Emerald Club. Almost 1400 Sonics 2007 season ticket holders made the same decision.[2] Plaintiff Robert Brotherson was a 2007 season ticket holder who renewed his tickets in early April 2007. Griffin Decl. (Dkt. # 34), Ex. H (Brotherson Depo. at 50, 64-66). In June 2007, after becoming concerned that the Sonics would leave Seattle, he called PBC ticket offices to inquire about a refund. *Id.* at 69-70. Although he did not formally request a refund, the representative told him that PBC would not issue one. *Id.* at 70. Plaintiff Carolyn Bechtel was a 2007 season ticket holder who renewed her tickets in early April 2007. Griffin Decl. (Dkt. # 34), Ex. I (Bechtel Depo. at 82-85). Plaintiff Patrick Sheehy, also a 2007 season ticket holder, renewed his tickets in May 2007. Tondini Decl. (Dkt. # 45) ¶ 18.

The three Plaintiffs seek relief under at least two different theories[3], and wish to pursue that relief on behalf of a class comprised of all Emerald Club members. They claim that PBC violated the Washington Consumer Protection Act ("CPA") by impliedly representing that the Sonics would remain in Seattle through the 2010 season in order to entice season ticket holders to renew, while simultaneously making undisclosed efforts to move the Sonics from Seattle. They also claim that PBC breached its Emerald Club contract with all Emerald Club members. The class would also seek injunctive relief requiring PBC to offer Oklahoma City Thunder 2010 season tickets to class members with prices and seat locations fixed according to the Emerald Club contract.

In three summary judgment motions, PBC contends that Plaintiffs cannot prove contract damages, cannot prove CPA damages, and are not entitled to injunctive relief. Plaintiffs' two summary judgment motions contend that PBC is liable on the contract and

---

[2] The original deadline for renewing season tickets and gaining Emerald Club benefits was April 25, 2007. Tondini Decl. (Dkt. # 105), Ex. B. There is no dispute that PBC extended that deadline many times. *See, e.g.,* Schoepflin Decl. (Dkt. # 99), Ex. B (Byrnes Depo. at 73-75). Some 2007 season ticket holders renewed even after the 2008 season had begun.

[3] The parties' motions address Plaintiffs' contract and Washington Consumer Protection Act claims, as well as their prayer for injunctive relief. So far as the court is aware, no motion targets Plaintiffs' unjust enrichment claim. 2d Amend. Compl. (Dkt. # 121) at 9-10.

ORDER – 6

CPA claims as a matter of law, but that a jury should determine damages. In addition, Plaintiffs seek certification of the class described above.

## III.  ANALYSIS

The court begins by considering the parties' five summary judgment motions. After determining the effect of those motions on Plaintiffs' claims, the court will turn to Plaintiffs' attempt to certify a class.

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must initially show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The opposing party must then show a genuine issue of fact for trial. *Matsushita Elect. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party must present probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). The court defers to neither party in answering purely legal questions. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).

## A.     Plaintiffs' Contract Claims

### 1.     Plaintiffs and PBC Entered the Emerald Club Contract.

At the threshold, the court must determine if Plaintiffs and PBC entered into a contract. The party seeking to rely on a contract bears the burden of proving that a contract was formed. *Jacob's Meadow Owners Ass'n v. Plateau 44 II, LLC*, 162 P.3d 1153, 1165 (Wash. Ct. App. 2007). Washington follows the "objective manifestation test" to determine the existence of a contract. *Keystone Land & Development Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004). The "unexpressed subjective intention of

ORDER – 7

the parties is irrelevant; the mutual assent of the parties must be determined by their objective acts or outward manifestations." *Ford v. Trendwest Resorts, Inc.*, 12 P.3d 613, 616 (Wash. Ct. App. 2000), *rev'd on other grounds*, 43 P.3d 1223 (Wash. 2002); *Multicare Med. Ctr. v. Dep't of Soc. & Health Servs.*, 790 P.2d 124, 132-33 (Wash. 1990). Ordinarily, the objective manifestations of mutual assent are an offer by one party and an acceptance by the other. *Yakima County (West Valley) Fire Protection Dist. v. City of Yakima*, 858 P.2d 245, 255 (Wash. 1993). Parties need not reach perfect assent, but rather assent to a "core of common meaning" that determines both parties' performance obligations with enough certainty to fashion a legal remedy. *Ford*, 12 P.3d at 616-17 (quoting Restatement (2d) of Contracts, § 20 cmt. b (1979)).

In this case, the court finds that any reasonable juror would conclude that PBC and Plaintiffs entered a contract, which the court will call the Emerald Club Contract (or "Contract"). Whether parties mutually assented to a contract is ordinarily a question of fact, *Sea-Van*, 881 P.2d at 1039, but like any factual question, a court can resolve it on summary judgment if "reasonable minds could reach but one conclusion." *Keystone*, 94 P.3d at 949 n.10; *see also Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1029 (9th Cir. 2006) (upholding summary judgment where "no reasonable juror could have decided th[e] issue in [the non-moving party's] favor").

The undisputed evidence shows an offer from PBC that contained all essential terms of the Emerald Club Contract. PBC communicated that offer primarily through the Brochure that it sent to all 2007 season ticket holders.[4] That Brochure has all the hallmarks of an offer. It called itself an "offer." Tondini Decl. (Dkt. # 105), Ex. 2 at

---

[4] The court relies on the Brochure because it was undisputedly provided to Plaintiffs before they renewed for the 2008 season. (Indeed, with possible exceptions for courtside ticket holders and tickets provided to PBC's promotional partners, it appears that all renewing 2008 season ticket holders received the Brochure before renewing.) There is evidence that PBC also communicated the Emerald Club offer through its website, through in-game announcements, through other media, and through individual communications between its ticket sellers and persons interested in renewing. *See* Pltfs.' Mot. (Dkt. 126) at 2-5. No one has offered evidence that those communications stated terms that conflict with the Brochure.

ORDER – 8

PBC_CA_100073 ("See inside for an unprecedented offer to Sonics Season Ticket Holders."). It stated the persons to whom the offer was open: all 2007 season ticket holders. It stated a fixed price: whatever price the ticket holder paid for 2007 tickets. It also stated several material terms with precision: promising not only 2008 season tickets, but the option to renew those tickets at the same price in the 2009 and 2010 seasons. *Bennett Veneer Factors, Inc. v. Brewer*, 441 P.2d 128, 132 (Wash. 1968) (noting that ordinary contract rules apply to formation of option contract). It promised that the only condition on exercising that option was "maintain[ing] an active full-season account in good standing through" the 2010 season. Moreover, the offer gave precise instructions for accepting it, including options for accepting it by telephone, by mail, or on the team's website, as well as three payment options.[5]

Against this evidence, PBC's assertion that the Brochure was not an offer is mystifying. PBC offers no evidence to support its assertion, relying instead upon cases holding that certain advertisements are not offers. Def.'s Mot. (Dkt. # 80) at 5-6 (citing *Wilkerson v. Wegner*, 793 P.2d 983 (Wash. 1990); *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983); *Mesaros v. U.S.*, 845 F.2d 1576 (Fed. Cir. 1988)). *Wilkerson* and *Foremost* revolve around facts so wholly inapposite that the court need not discuss them here. *Mesaros* is also factually inapposite, but it provides an elegant legal analysis that squarely rejects PBC attempt to characterize the Brochure as a mere advertisement. 845 F.2d at 1580-81. Advertisements, even those that state specific prices and specific instructions for communicating the intent to purchase the advertised goods, are generally not offers because they are communicated to a wide audience. *Id.* at 1581. Recipients of advertising are presumed to understand this, and to understand that

---

[5] The parties devote substantial attention to the assertion that the Brochure was (or was not) an invitation to accept a unilateral contract. *See Multicare Med. Ctr.*, 790 P.2d at 131 (noting that unilateral contracts are formed upon the offeree's execution of the acceptance instructions included in an offer). The court need not decide this issue. Even if PBC could have declined to accept the performance that the Brochure called for, the undisputed evidence is that it did not. PBC accepted payment without imposing additional terms or conditions.

ORDER – 9

construing an advertisement as an offer could cause "the advertiser [to] be bound by an excessive number of contracts requiring delivery of goods far in excess of amounts available." *Id.* By contrast, all recipients of the Emerald Club offer were 2007 season ticket holders, who would undisputedly know that PBC was holding seats for them, pending their acceptance. PBC gave 2007 season ticket holders no reason to believe that it could not fulfill their demand for seats. Indeed, the Brochure itself was an explicit promise that it could provide seats for all renewing season ticket holders.

Having received the Emerald Club offer, there is no dispute that each Plaintiff accepted PBC's offer by paying the price stated in accordance with the Brochure's instructions. Moreover, no one disputes that Plaintiffs' payments were adequate consideration for the Emerald Club Contract. PBC occasionally suggests that Plaintiffs paid no separate consideration for the renewal option contained in the Contract. *E.g.*, Def.'s Reply (Dkt. # 104) at 12 ("the reality is that [Plaintiffs] paid nothing for that option"). The law, however, requires no separate consideration for an option contained within a broader contract:

> When an option agreement is a subsidiary part of a larger transaction, as where a party is given an option to renew a contract, the consideration for the option itself is rarely a definitely determinable portion of what the option holder gives to the other party. The parties need not make a separate valuation of the option in order for it to be enforceable.

*Metro. Park Dist. v. Griffith*, 723 P.2d 1093, 1099 (Wash. 1986). Plaintiffs paid a price for both 2008 season tickets and the option to renew them in the next two seasons.

PBC's efforts to raise a genuine issue of material fact regarding contract formation are unavailing. PBC offers evidence that some season ticket holders, including a representative from Washington Mutual, the corporation with the most Sonics season tickets, did not read the Brochure before renewing. There is no dispute that each of the three Plaintiffs received the Brochure before renewing their tickets, just as Washington Mutual did. Even if a Plaintiff or another offeree failed to read the Brochure, a party who

ORDER – 10

accepts a written offer without reading it nonetheless *objectively* manifests his or her assent to its terms. *Yakima County*, 858 P.2d at 255. A party who declines to read an offer "cannot argue that mutual assent was lacking" as long as the party had the "opportunity to read the contract, the contract was 'plain and unambiguous,' the party was capable of understanding the contract, and no fraud, deceit, or coercion occurred." *Id.* Indeed, to the extent that failure to read an offer can ever serve as a defense to contract formation, it is a defense to be invoked by the party who failed to read, not by the party who provided the written offer. *Id.* PBC cannot avoid the Emerald Club Contract by asserting the defenses of other parties to the contract. Even if it could, those defenses are not valid where all Plaintiffs (and presumably all Emerald Club offerees) had a chance to read the offer and its plain, unambiguous terms.

For the same reason, the court rejects PBC's argument that because Mr. Brotherson decided to renew his season tickets before receiving the Brochure, he did not accept the Emerald Club offer on its terms. PBC provides no legal authority to support this contention. Mr. Brotherson undisputedly renewed his season tickets after receiving the Brochure, and undisputedly complied with PBC's instructions for accepting the offer contained therein. Tondini Decl. (Dkt. # 45), Ex. 18 (Brotherson renewal form). He accepted PBC's offer on its terms, objectively manifesting his assent thereto. *Id.* (checking box stating "Yes, I would like to renew my Sonics season tickets for 2007-08 and establish my Emerald Club membership."). When he decided to do so is irrelevant.

### 2. PBC Has No Absolute Right to Revoke Tickets it Sold to Emerald Club Members, and Thus Cannot Avoid Damages on That Basis.

Having established the existence of the Emerald Club Contract, the court is equipped to consider the ultimate relief that the parties seek in their contract-related summary judgment motions. Plaintiffs argue that PBC breached the Contract as a matter of law by refusing to honor the option to renew tickets for 2009, and will breach the Contract again as a matter of law by not honoring the option for the 2010 season. *See*

ORDER – 11

*Highlands Plaza, Inc. v. Viking Inv. Corp.*, 435 P.2d 669, 677 (Wash. 1967) (noting that "positive refusal to perform a contract before performance is due" entitles party to immediate claim for breach). Plaintiffs contend that the only contract issue remaining for a jury is the amount of damages.[6] Defendants disagree that they breached the Contract, and contend that Plaintiffs have no damages as a matter of law.

PBC's damages attack turns on its assertion that the tickets it agreed to sell (at Plaintiffs' option) for future seasons are revocable at PBC's discretion, for any reason or no reason at all, with no remedy for revocation other than a refund of the purchase price. This assertion is a predicate for PBC's argument that even if it breached the Emerald Club Contract by not selling 2009 season tickets, and intends to breach the contract by not selling 2010 season tickets, no damages flow from its breach. In its view, its unfettered right to revoke the tickets merely by paying the purchase price means that Plaintiffs, who have not yet paid any price for 2009 or 2010 season tickets, have suffered no economic harm.

PBC's damages argument depends implicitly on the assertion that the term "ticket," which it used repeatedly in the Emerald Club Contract, means "license revocable at will." Its argument, therefore, though disguised as a dispute over damages, is at its core a dispute over contract interpretation.

In Washington, contract interpretation is a question of law. *Tanner Elec. Coop. v. Puget Sound Power & Light*, 911 P.2d 1301, 1310 (Wash. 1996). Where interpretation "depend[s] on the use of extrinsic evidence," or the extrinsic evidence admits more than one "reasonable inference," the court cannot interpret the contract as a purely legal

---

[6] In Plaintiffs' contract-related summary judgment motion, they asserted two breaches of the Contract: the refusal to honor the option described above, and the breach of an implied contract term requiring the team to play its home games at Key Arena through 2010. Dkt. # 126 at 2. The court finds no indication that Plaintiffs seek contract damages for PBC's decision to move the team to Oklahoma. Indeed, in their reply brief, they abandoned such a claim, stating that "the guaranteed option contract for Emerald Club members . . . is the *only contract issue* before the Court in this case." Dkt. # 141 at 9 (emphasis added). For that reason, the court declines to address Plaintiffs' contention that the Contract contains an implied term requiring the Sonics to play in Seattle through 2010.

ORDER – 12

matter. *Id.* These limitations, which arose from the decision in *Berg v. Hudesman*, 801 P.2d 222 (Wash. 1990), have engendered "much confusion" over a court's role in contract interpretation. *Hearst Commc'ns., Inc. v. Seattle Times Co.*, 115 P.3d 262, 266 (Wash. 2005). In *Hearst*, the Washington Supreme Court clarified that extrinsic evidence applies only "'to determine the meaning of *specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict, or modify the written word.'" *Id.* at 267 (quoting *Hollis v. Garwall, Inc.*, 974 P.2d 836, 843 (Wash. 1999)) (emphasis in *Hearst*). Absent extrinsic evidence pertaining to a specific term, the court must "give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Id.* (directing courts to interpret "what was written" rather than "what was intended to be written").

Nowhere in the Emerald Club Contract does PBC mention that the tickets it was selling are revocable, much less revocable at will. Given this omission, PBC finds no support for the notion that the revocable nature of the tickets is disclosed within the four corners of the Contract. Any reasonable person entering the Emerald Club Contract would have understood that the tickets were licenses, in the sense that he or she would have understood that the tickets did not create a property interest in a seat or access to Key Arena. A reasonable person likely would have understood that PBC could revoke that license under certain circumstances (for example, inappropriate conduct by the ticketholder). A reasonable person likely would have understood that the license could be effectively revoked in other circumstances (for example, when a game is cancelled).[7] But the court finds no indication, whether in the form of common understanding of the

---

[7] Indeed, the season ticket holder guide that PBC gave Plaintiffs *after* they entered the Emerald Club Contract is consistent with these understandings. Tondini Decl. (Dkt. # 105), Ex. 4. The guide mentions the revocability of tickets. In a section addressing "Guest Conduct Guidelines," the guide explains that unruly behavior by ticketholders can result in ejection from a game and possibly "loss of season tickets and all rights and benefits accorded with season ticket purchase." Tondini Decl. (Dkt. # 105), Ex. 4. It also explains that each ticket is a "license for the use of a designated seat(s) in Key Arena." Nowhere, however, does it suggest that the license is revocable at will.

ORDER – 13

term "ticket" or evidence of the understanding of reasonable consumers, that any person reading the Emerald Club Contract would understand that the licenses sold were revocable at will. Indeed, if a reasonable consumer understood that he or she was buying nothing other than the right to be subject to the unfettered whim of PBC, the court queries why anyone would have entered the Emerald Club Contract.[8] Moreover, if PBC was selling nothing other than the right to be subject to its unfettered whims, why did it not state as much in the Emerald Club offer?

PBC's extrinsic evidence only reinforces that "ticket" does not mean a freely revocable license. As the court has noted (*supra* n.7), the guide that PBC sent season ticket holders *after* they entered the Emerald Club Contract discusses conditions that would permit it to revoke tickets, but does not state that tickets were revocable at will. On the other hand, the tickets themselves, which Emerald Club members received after they entered the contract, declare on their back sides that "this ticket is a revocable license." Tondini Decl. (Dkt. # 105), Ex. 3. The ticket license also contains a clause permitting PBC to revoke the license for any reason (or no reason at all), conditioned only on PBC's "refunding to the Holder of the printed purchase price of this ticket." *Id.* What PBC ignores, however, is that the license printed on the back of each ticket, by its own terms, does not bind the ticket holder until he or she enters the arena for the game. *Id.* ("*By using this ticket and entering the arena*, the Holder agrees to be bound by the terms of this license.") (emphasis added). The license printed on each ticket is a per-game license that does not attach until the ticket holder attends the game. Even if the license is enforceable, an issue that the court need not decide, it gives PBC a single-game

---

[8] As PBC acknowledges, a contract whose performance obligations are wholly discretionary would be illusory. Def.'s Opp'n (Dkt. # 136) at 12-13 (citing *Interchange Assocs. v. Interchange, Inc.*, 557 P.2d 357 (Wash. 1976)). The court notes that where possible, "contracts must be construed to avoid rendering contractual obligations illusory." *Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 743 (Wash. 2005) (citing *Taylor v. Shigaki*, 930 P.2d 340, 344 (Wash. Ct. App. 1997)). It is not necessary, however, to invoke this principle to construe the Emerald Club Contract.

ORDER – 14

right to revoke a ticket after the ticket holder enters the arena for that game.  PBC offers no explanation of how that right permits it to revoke future tickets.

PBC's argument relies not on intrinsic or extrinsic evidence, but on the claim that the court should use what PBC believes is the *legal* definition of a ticket in place of the definition that it objectively communicated to Emerald Club members.  According to PBC, the law treats tickets to spectator events as revocable-at-will licenses.  Even if that were true, however, there is no reason to presume that a reasonable person reviewing the Emerald Club Contract would seize upon the legal definition of a "ticket."  PBC focuses much attention on precedents that, in its view, establish that the law treats tickets as revocable licenses.[9]  Only rarely does it acknowledge the proposition that matters in this case:  that "the law *presumes* that *all buyers know* ticket sales and the honoring of tickets is discretionary and subject only to a right of refund."  Def.'s Opp'n (Dkt. # 136) at 9 (emphasis added).  For this proposition, PBC provides no legal support, and the authority it cites only highlights as much.  In both *Showalter v. City of Cheney*, 76 P.3d 782 (Wash. Ct. App. 2003), and *Billington Builders Supply, Inc. v. City of Yakima*, 544 P.2d 138 (Wash. Ct. App. 1975), the court rejected the claims of permissive users of city property. *Showalter*, 76 P.3d at 785-86 (discussing business owner who had permissively used city sidewalk to support an awning); *Billington*, 544 P.2d at 140 (discussing business owner who permissively used city street for customer parking).  In both cases, the court found

---

[9] PBC cites a precedents in which courts upheld a ticket issuer's decision to revoke a ticket. *See, e.g., Finnesey v. Seattle Baseball Club, Inc.*, 210 P. 679, 680 (Wash. 1922); *Soderholm v. Chicago Nat'l League Ball Club, Inc.*, 587 N.E.2d 517 (Ill. App. 1992).  In each of the cases PBC cites, however, the issuer revoked the ticket because of the holder's conduct.  For example, in the sole Washington case that PBC cites that discusses tickets as licenses, the issuer revoked the ticket because he suspected the holder of betting on baseball games. *Finnesey*, 210 P. at 680. The court held that the issuer had the right to revoke, noting the "well-settled" rule that "a ticket of admission is a mere license revocable at the will of the proprietor, even after the holder has entered the place of amusement and taken the seat described in the ticket." *Id.* at 681.  No decision has applied the *Finnesey* rule or its analog to an issuer who revokes a ticket not because of the holder's conduct, but because of the issuer's profit motive.  In this case, PBC wishes to effectively "pre-revoke" the 2009 and 2010 season tickets it promised to Plaintiffs.  It wishes to do so, the court presumes, solely because it sold equivalent tickets at a higher price to Oklahoma Thunder fans, and it desires to curry the favor of those fans rather than Sonics fans.

ORDER – 15

that the licensees had "presumed knowledge" that the cities could withdraw permission to use the land at any time. *Showalter*, 76 P.3d at 785; *Billing*, 544 P.2d at 140. In each case, the licensee had paid nothing for its license, and in each case, there was no contract in which the city promised to permit the licensed use. In this case, Plaintiffs paid for their tickets (and the option to purchase more tickets), and did so via a contract in which PBC never mentioned the possibility that it would or could revoke the tickets. PBC cites no authority that establishes Plaintiffs' "presumed knowledge" that they had bought nothing but a series of revocable-at-will licenses. Indeed, that PBC needed to print on its tickets that they were revocable at will after the holder entered the arena is itself evidence that the term "ticket," by itself, is insufficient to communicate revocability to a reasonable consumer. If PBC intended to sell tickets that could be revoked at any time for any reason, it was obligated to objectively communicate as much in the Emerald Club offer.

Because the Emerald Club Contract is conspicuously silent regarding the revocation of tickets, and no extrinsic evidence supports the notion that the licenses were revocable-at-will except on a per-game, post-entry basis, the court finds that the term "ticket" in the Contract does not mean a license revocable at will. PBC's attempt to avoid breach of contract damages on that basis fails accordingly.

Before moving on from PBC's attempt to avoid contract damages, the court notes that it has reviewed the numerous cases that PBC cited in which disappointed season ticket holders have attempted to sue to enforce their right to renew their tickets. Those cases provide a fascinating portrait of the realities of modern professional sports, and the "sordid history of arrogant disdain" that team management can show for fans. *Charpentier v. Los Angeles Rams Football Co.*, 89 Cal. Rptr. 2d 115, 124 (Cal. App. 1999). They also reflect that season ticket holders typically, but not invariably, lose in court when they seek to force a team to permit them to renew. *E.g.*, *Soderholm*, 587 N.E.2d at 521 ("[W]e conclude that no contract existed entitling plaintiff to a right of first

ORDER – 16

refusal to defendant's season tickets."); *Charpentier*, 89 Cal. Rptr. 2d at 122 (finding no express or implied promise to permit renewal after relocation of team); *Beder v. Cleveland Browns, Inc.*, 717 N.E.2d 716, 721 (holding that team breached right of first refusal by not permitting ticket holder to renew tickets after relocation of team). Unsurprisingly, however, no precedent that PBC cites addresses an "unprecedented commitment" like the one it made in the Emerald Club Brochure. Unlike other teams facing relocation, PBC contracted to permit fixed-price renewals for two years. The court will hold PBC to its bargain.

### 3. Neither Uncertainty Over PBC's Future in Seattle Nor Its Decision to Move to Oklahoma City Relieves PBC of Its Contract Obligations.

In several ways, PBC attempts to use its move to Oklahoma to avoid the Emerald Club Contract. It first contends that because of uncertainty surrounding the Sonics' future in Seattle while Plaintiffs entered the Contract, no Plaintiff could have reasonably believed that PBC made any promises that extended beyond the 2008 season. It also contends that the Sonics remaining in Seattle was a condition precedent to Plaintiffs' right to exercise their option to buy tickets in the 2009 and 2010 season. The court finds no merit in either argument.

There is no question that uncertainty surrounded the Sonics during the time that the Emerald Club offer was open for acceptance. As detailed previously (*supra* Part II), Seattle media reported extensively on the possibility that the team would move. After the legislature declined to finance a new arena, local media focused on PBC's explicit statements that it would explore breaking the Key Arena lease and leaving before 2010. When Plaintiffs entered the Emerald Club Contract, there is ample evidence that they either had doubts or should have had doubts about the Sonics' future in Seattle beyond the 2008 season.

PBC contends that given the uncertainty, the court should either find that no person could believe that the Emerald Club Contract contained an option to renew season

ORDER – 17

tickets after the 2008 season, or it should imply a contract term making the option conditional on the Sonics remaining in Seattle. The latter contention is wholly unavailing. Whatever uncertainty surrounded the Sonics, PBC used the Emerald Club Brochure to repeatedly tout its "unprecedented commitment" to provide "cost certainty" through the 2010 season. Tondini Decl. (Dkt. # 105), Ex. B. It promised that "membership in the exclusive Emerald Club will *always* differentiate your account status and provide you with price assurance." *Id.* at PBC_CA_100077 (emphasis added). In doing so, PBC never suggested that either its "unprecedented commitment" or cost certainty depended on the Sonics playing at Key Arena.[10] Whatever uncertainty PBC had about the Sonics' venue through 2010, it declined to make the Emerald Club offer conditional on the Sonics remaining in Key Arena. It could have done so easily with the addition of a disclaimer that made the renewal option for the 2009 and 2010 seasons contingent on the Sonics remaining at Key Arena. It declined to do so. Through both affirmative assurances of three-season price certainty and silence regarding any venue-based conditions placed on that certainty, the Emerald Club Brochure objectively communicated a promise that the right to renew was not contingent on the Sonics staying in Seattle. Under these circumstances, there is no basis to construe the Contract's renewal option as contingent on whether the team would play games at Key Arena.

For similar reasons, neither the subjective or objective doubts of Emerald Club offerees affects the formation of the Contract. PBC strays far from contract law by arguing that what Plaintiffs subjectively believed about whether the Sonics would stay in Seattle is relevant. It is not. Even if every person who entered the Emerald Club Contract believed that the Sonics would move at the end of the 2008 season, that belief does not affect the Contract's validity. PBC promised the right to renew season tickets at

---

[10] As the court previously noted (*supra* Part II), PBC's choice not to add relocation conditions to the Emerald Club Contract was deliberate. Mr. Byrnes testified that PBC designed the Brochure to project long-term confidence that the team would stay in Seattle. This is not evidence of what PBC communicated to Emerald Club offerees, but it shows that the Brochure's objective manifestations that the Sonics would remain in Seattle through 2010 were no accident.

ORDER – 18

a fixed price in 2009 and 2010.  The court has no doubt that many of the people who accepted the Emerald Club offer – especially those who accepted later in 2007 – had concerns about whether the team would play in Seattle through the 2010 season.  The undisputed objective evidence is that, despite any doubts about whether PBC would live up to its bargain, season ticket holders accepted the Emerald Club offer, including the renewal option.  Parties often enter into contracts with doubts about whether the other party will perform.  Should those doubts come to fruition, the party can sue for breach.  PBC's argument that uncertainty about future performance is a defense to contract *formation* finds no support in the law.  A contract would mean little if a party could avoid it merely by proving that the party it contracted with thought that breach was possible from the outset.

### 4. Questions of Fact Prevent the Court from Deciding that PBC Breached the Emerald Club Contract as a Matter of Law.

As the court has noted (*supra* n.6), the sole provision of the Contract now at issue is the option to purchase 2009 and 2010 season tickets.  On the record before the court, it is undisputed that Plaintiffs did not exercise that option for 2009 tickets, and it is undisputed that PBC has no intent to permit them to exercise that option for 2010 tickets.  Despite these facts, one issue prevents the court from determining that PBC breached the Emerald Club Contract as a matter of law:  Plaintiffs may have waived or forfeited their renewal option.

An option contract gives the optionee a unilateral right to purchase the subject of the option, provided he timely exercises that right.  *Pardee v. Jolly*, 182 P.3d 967, 973 (Wash. 2008) ("If the optionee fails to exercise the option within the time specified or in the manner provided, all rights under the contract, along with any consideration given, are forfeited.").  Although the optionee has the obligation to timely exercise the option, the optionor has a concomitant obligation not to frustrate the exercise of the option.  *See Whitworth v. Enitai Lumber Co.*, 220 P.2d 328, 330 (Wash. 1950) (finding waiver where

ORDER – 19

"optionees, *through no fault or neglect of the optionor*, permitted their rights under the option contract to expire") (emphasis added). Generally, time is of the essence in exercising option rights. After consideration of the facts surrounding the exercise of an option, however, the court can grant an equitable grace period. *Pardee*, 182 P.3d 976; *Heckman Motors, Inc. v. Gunn*, 867 P.2d 683, 685 (Wash. Ct. App. 1994) (discussing equitable power to excuse late exercise of option).

In this case, several issues make the court unable to determine as a matter of law whether Plaintiffs timely exercised their option. There is no dispute that once PBC determined that it would play in Oklahoma City, it ceased all efforts to honor the option in the Emerald Club Contract. It did not contact any Emerald Club Members regarding their renewal rights for the 2009 season. Instead, it sold all the tickets it could to fans who wanted to see the Thunder. Plaintiffs, however, did not request renewal, even though they unquestionably knew that PBC was selling the tickets to others. *See* Sept. 26, 2008 Order (Dkt. # 91) at 3 (describing Plaintiffs' awareness of Thunder ticket sales process). The Emerald Club Contract is silent as to how the parties would exercise the renewal option in upcoming seasons, or the time period during which they could exercise the option. For the 2008 season, PBC initiated the renewal process by mailing the Brochure to renewing season ticket holders, and initially imposed a deadline for renewal several months in advance of the 2008 season. To secure more renewals, PBC extended the renewal deadline several times. On this evidence, the most reasonable conclusion is that the parties understood that PBC would, in subsequent seasons, send out a renewal notice to Emerald Club members, perhaps placing a reasonable time limit on the right to exercise that option. *Turner v. Gunderson*, 807 P.2d 370, 374 (Wash. Ct. App. 1991) (noting that a reasonable time for exercising an option can be implied). Other conclusions are possible, however, and the evidence before the court does not dispose of the issue as a matter of law. Moreover, even assuming that PBC failed to meet its obligation to initiate a renewal period for the 2009 season, the court cannot say as a

ORDER – 20

matter of law that this absolved Plaintiffs of the obligation to request renewal at a reasonable time. The evidence reveals that Plaintiffs could have done more to communicate their desire to renew before PBC sold season tickets to Oklahoma fans. This lawsuit appears to be the sole objective communication from Plaintiffs to PBC that Plaintiffs intended to exercise their renewal options. Under these circumstances, a jury must decide whether Plaintiffs acted appropriately to exercise their options for the 2009 season, or whether PBC's failure to make renewal available excuses Plaintiffs' failure to insist more vehemently that PBC honor its commitment. *See Turner*, 807 P.2d at 374-75 (discussing repudiation and anticipatory breach). Moreover, the court must determine whether to use its equitable power to excuse any delay in exercising the option.

If a jury finds that Plaintiffs waived their option for the 2009 season, and no equitable exception applies, then a jury must necessarily find that Plaintiffs waived their options for the 2010 season. The Emerald Club Contract expressly required all season ticket holders to "maintain an active full-season account in good standing through" the 2010 season. Tondini Decl. (Dkt. # 105), Ex. B. Thus, if Plaintiffs inexcusably failed to exercise their option to purchase 2009 season tickets, they lost their 2010 option.

### 5. If PBC Breached the Emerald Club Option, Plaintiffs Can Prove Expectation Damages.

Provided that Plaintiffs did not waive their option rights, nothing precludes them from proving damages. As both parties agree, a party who proves a breach of contract may claim damages based on his or her "expectation interest":

> Contract damages are ordinarily based on the injured party's expectation interest and are intended to give that party the benefit of the bargain by awarding him or her a sum of money that will, to the extent possible, put the injured party in as good a position as that party would have been in had the contract been performed.

*Mason*, 792 P.2d at 146; *see also* Def.'s Mot. (Dkt. # 80) at 9; Pltfs.' Opp'n (Dkt. # 97) at 17. To be recoverable, damages must have been "reasonably foreseeable by the party to

ORDER – 21

be charged at the time the contract was made." *Wilkins v. Grays Harbor Cmty. Hosp.*, 427 P.2d 716, 721 (Wash. 1967).

In this case, Plaintiffs expected to have the right to purchase season tickets. Their primary expectation, the court assumes, was to use those tickets to watch basketball games. But, as PBC expressly acknowledged in the Emerald Club Contract, another expectation was that Plaintiffs would be able to sell tickets for games that they did not want to see. Tondini Decl. (Dkt. # 105), Ex. B (touting ability to "[s]ell your tickets online via the Sonics Ticket Marketplace"). Depending on factors well within PBC's contemplation, such as the team's performance, star quality of the team's players, or the quality of the opponent's team or players, tickets might be more valuable than the price Plaintiffs paid for them. In this case, it appears that PBC's season tickets have increased in value because of the increased demand accruing to a new arena and a new home city. These, however, are not issues that the court can resolve as a matter of law. A jury must decide what damages are, and whether those damages were within the reasonable expectation of the parties when they entered the Emerald Club Contract.

**B.** **Plaintiffs' Prayer for Specific Performance of the Emerald Club Contract**

Assuming that Plaintiffs still have the right to exercise their option to purchase 2010 season tickets, *see supra* Part III.A.4, they seek specific performance of that option. They ask the court to order PBC to convey tickets to them on the terms of the option. They thus seek specific performance in the form of an injunction mandating ticket sales. PBC moves for summary judgment disposing of the specific performance request in its entirety.

Plaintiffs' request for specific performance is the endpoint of a series of alleged-then-abandoned claims for equitable relief. When Plaintiffs filed this action, their complaint prayed for an injunction that would force the Sonics to play in Seattle through the 2010 season. Plaintiffs never moved for injunctive relief, and withdrew their prayer

ORDER – 22

after the settlement of the lease litigation between PBC and the City of Seattle. They then stated their intent to pursue injunctive relief forcing PBC to not only provide them with 2009 season tickets for the Thunder, but to pay their travel and lodging costs for attending games in the distant venue. Dkt. # 62 at 2-3. Again, they never sought injunctive relief, even though they knew that PBC was selling 2009 season tickets to Thunder fans. After the court ordered them to explain how they would seek injunctive relief to procure tickets that had already been sold, Plaintiffs modified their request for injunctive relief again, praying solely for an injunction forcing PBC to sell them 2010 season tickets. Again, Plaintiffs have done nothing to move for such relief.

The court recounts this history because the injunction Plaintiffs seek, which amounts to specific performance of the Emerald Club Contract option, is an equitable remedy committed to the discretion of the court. *Crafts v. Pitts*, 162 P.3d 382, 386 (Wash. 2007); *Paradiso v. Drake*, 143 P.3d 859, 861 (Wash. Ct. App. 2006). In considering whether to exercise its discretion in this case, the court runs headlong into a threshold barrier: there is no indication that Plaintiffs want the relief they are seeking. Ordinarily, a prayer for specific performance would suffice, but in this case, Plaintiffs show no willingness to pursue that prayer. As the court has already noted, Plaintiffs made no effort to purchase 2009 Oklahoma Thunder tickets. Not only did they file no motion in this action as PBC sold the tickets that they supposedly want, they never took the simple actions that an ordinary consumer takes when he or she wants goods. There is no evidence that any Plaintiff attempted to buy 2009 Thunder tickets. There is ample evidence that, given their belief that Mr. Bennett and PBC duped them into purchasing 2008 season tickets, and lied about their intent to keep the Sonics in Seattle, no Plaintiff wishes to support a PBC-owned team. Even now, as the Thunder play out their season, and Plaintiffs oppose PBC's summary judgment motions, there is no indication that any Plaintiff has made a shred of effort to attend a Thunder game, or wishes to expend the money and time it would take to attend a game. Ms. Bechtel, for example, occasionally

ORDER – 23

found the commute to Key Arena too lengthy to attend Sonics games. It seems unlikely, to put it charitably, that she wishes to commute to another time zone. Indeed, Plaintiffs unabashedly declare that they "most likely" will never attend a Thunder game, but rather will attempt to "resell the[ir] tickets for a profit through the Thunder's Ticket Exchange," a website that facilitates ticket resale. Pltfs.' Opp'n (Dkt. # 133) at 9. Plaintiffs just want money.

Plaintiffs' admission that they want money, not the chance to see Thunder games, is doubly fatal to their specific performance request. A plaintiff seeking specific performance of a contract must demonstrate that damages are not an adequate remedy. *Paradiso*, 143 P.3d at 862; *Crafts*, 162 P.3d at 386. Plaintiffs make no effort to explain why damages would be inadequate. They would be hard pressed to do so, given their admission that money would satisfy them. Plaintiffs cite no authority that even discusses specific performance. Specific performance is freely available to enforce contracts for the sale of land or real property interests. *See, e.g.*, *Tombari v. Griepp*, 350 P.2d 452, 454-55 (Wash. 1960) (noting that because land is unique, it has no readily ascertainable market value). Most Washington authority discussing specific performance focuses on real property. Only rarely is specific performance available in other contexts. *See, e.g.*, *King Aircraft Sales, Inc. v. Lane*, 846 P.2d 550, 556 (Wash. Ct. App. 1993) (affirming specific performance of airplane sale contract, noting that the planes were "rare enough so as to make the ability to cover virtually impossible"); *Rogers Walla Walla, Inc. v. Ballard*, 553 P.2d 1372, 1377-78 (Wash. Ct. App. 1976) (affirming specific performance of contract for sale of stock of closely held corporation, noting that stock was not available on open market and had no ascertainable market value). Plaintiffs make no effort to explain why a contract to buy Thunder tickets, which are available on the open market and easy to price, is the sort of non-realty contract that a court should specifically enforce.

ORDER – 24

1    Neither Plaintiffs' conduct nor their legal argument establishes any entitlement to

2    specific performance. Even if specific performance were available as a matter of law, the

3    court would not exercise its equitable power to award Plaintiffs tickets that they do not

4    want. For these reasons, the court dismisses Plaintiffs' claims to the extent they seek

5    specific performance or an injunction, and declines to reach PBC's other arguments

6    against Plaintiffs' prayer for equitable relief, including PBC's contention that Oklahoma

7    Thunder fans currently in possession of season tickets are indispensable third parties.[11]

8    **C.    Plaintiffs' CPA Claim**

9        Plaintiffs' CPA claim focuses on PBC's alleged deceptive conduct in marketing

10   the Emerald Club. They contend that PBC used the Emerald Club offer to suggest that

11   the Sonics would play in Seattle through the 2010 season, while failing to disclose that

12   PBC was working secretly to move the team to Oklahoma as soon as possible. Plaintiffs

13   seek summary judgment that PBC violated the CPA, reserving only the question of

14   damages for the jury. Defendants contend that its liability under the CPA is a question

15   for the jury, and that Plaintiffs have failed to prove compensable damages arising from its

16   deceptive conduct[12] as a matter of law.

17       A private party bringing a CPA claim must prove five elements: "(1) an unfair or

18   deceptive act or practice, (2) that occurs in trade or commerce, (3) a public interest, (4)

19   injury to the plaintiff in his or her business or property, and (5) a causal link between the

20   unfair or deceptive act and the injury suffered." *Indoor Billboard/Washington, Inc. v.*

21   *Integra Telecom, Inc.*, 170 P.3d 10, 17 (Wash. 2007) (citing *Hangman Ridge Training*

---

[11] The court notes that while PBC insists that the tickets it promised to Plaintiffs are revocable at will, it makes no such representations about the tickets that it sold to Thunder fans. In PBC's view, the tickets that Plaintiffs want are valueless revocable-at-will licenses; the same tickets in the hands of Thunder fans are valuable interests that elevate the fans to the status of indispensable third parties. PBC makes no effort to explain the inconsistency.

[12] In analyzing Plaintiffs' CPA claim, the court looks solely to the injury caused by PBC's deceptive failure to disclose its intent to move the Sonics to Oklahoma. Plaintiffs have evidence of other injuries, most notably damages related to the exercise of the Emerald Club renewal option, but those damages arise from PBC's breach of contract, not the deceptions it used to promote that contract.

ORDER – 25

*Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986)).  An injury to business or property excludes certain harms, including physical injuries, emotional distress, and inconvenience unaccompanied by pecuniary harm.  *Stephens v. Omni Ins. Co.*, 159 P.3d 10, 25 (Wash. Ct. App. 2007); *Michael v. Mosquera-Lacy*, 165 P.3d 43, 47 (Wash. Ct. App. 2007), *rev'd on other grounds*, 2009 Wash. LEXIS 73 (Wash. Feb. 5, 2009).  But, so long as a plaintiff shows an injury to business or property, he or she need not prove monetary damages.  *Mason v. Mortgage Am., Inc.*, 792 P.2d 142, 148 (Wash. 1990).  A plaintiff establishes a cognizable injury if his or her "property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal."  *Id.*

For purposes of analyzing Plaintiffs' CPA claim, the court assumes without deciding that PBC engaged in "unfair or deceptive conduct" by promoting the Emerald Club while failing to disclose that it was actively working to relocate the Sonics to Oklahoma as soon as the 2009 season.  There is ample evidence from which a jury could conclude that PBC was working to relocate the Sonics even as it promoted the Emerald Club.  There is also ample evidence that PBC intentionally withheld information about its relocation plans to boost ticket sales.  Plaintiffs have provided more than enough evidence that PBC acted deceptively.  The CPA, however, requires more.

PBC argues that Plaintiffs have failed to offer any evidence of a compensable CPA injury arising from its deceptive conduct.  Plaintiffs believe that they are entitled to a refund of the entire purchase price of their 2008 season tickets, because they would not have purchased the tickets but for PBC's deceptive promotion of the Emerald Club.  As PBC notes, however, this argument suffers from a fundamental defect.  Regardless of what Plaintiffs might have done if they had known about PBC's undisclosed machinations to relocate the team, they purchased 2008 season tickets and attended every game that they could.  They also took advantage of other Emerald Club benefits, including special events.  Thus, they received at least some benefit from the money they

ORDER – 26

paid, and are in no position to seek a full refund. For example, in *Mason*, the court reduced a trial court's CPA damage award to reflect that the plaintiff had benefited from the partial completion of excavation work on his property. 792 P.2d at 147 (noting that trial court's damage computation allowed plaintiff to "receive the benefit of the site preparation work without having paid any fee for such improvements.").

Plaintiffs fall well short in their effort to establish their entitlement to a full refund. Citing *Golob v. George S. May Int'l Co.*, 468 P.2d 707 (Wash. Ct. App. 1970), they contend that because PBC's deceptive conduct induced them to buy season tickets, "the appropriate remedy is restitution for the amount they paid for the tickets." Pltfs.' Opp'n (Dkt. # 107) at 11. *Golob* squarely rejects Plaintiffs' contention. The *Golob* court explained that complete restitution is appropriate only where the benefit that a plaintiff receives from the defendant's partial performance is "worthless[,] or if the fact of the benefit or the monetary benefit of such part performance is not proved . . . ." *Id.* at 713. Here, PBC has provided ample evidence of the benefits that Plaintiffs received and their value. In such circumstances, the defendant "may set off the monetary value of his part performance against the aggrieved party's claim." *Id.* at 712. In *Mason*, the court applied the same principles, reducing a CPA judgment to set off the value of benefits the plaintiff received. 792 P.2d at 147. Plaintiffs have offered no evidence that the benefits they received were worthless; they have offered at best the sort of "subjective, self-serving characterization" of the value of the benefits that is insufficient to establish damages. *ESCA Corp. v. KPMG Peat Martwick*, 939 P.2d 1228, 1234 (Wash. Ct. App. 1997) (setting aside CPA verdict where plaintiff failed to offer proof of the value of the benefits it received); *see also Haner v. Quincy Farm Chems., Inc.*, 649 P.2d 828, 830 (Wash. 1982) ("The fact of loss must be established with sufficient certainty to provide a reasonable basis for estimating that loss.") (citation omitted).

Having failed to provide evidence from which a jury could conclude that they received no benefit from the price they paid PBC, Plaintiffs must produce some evidence

ORDER – 27

of an injury. Despite unambiguous instruction from the very cases on which they rely, Plaintiffs adhered to their insistence that they were entitled to a full refund until their final reply brief. There, they acknowledged that a full refund "is perhaps not the only way in which damages might be calculated." Pltfs.' Reply (Dkt. # 141) at 19. To show damages, however, they must show a CPA injury from which damages could flow. The court finds that they have failed to do so.

Plaintiffs present no evidence from which a jury could conclude that Plaintiffs suffered an injury to their business or property as a result of PBC's deceptive conduct. Plaintiffs took advantage of the benefits of their 2008 season tickets to the greatest extent they could. Plaintiffs may have enjoyed Sonics games less as it became more likely that the team would leave Seattle at the end of the season, but that is at best the sort of mental injury that the CPA does not recognize. Plaintiffs could have provide, at least theoretically, evidence that there is a difference in the value of the benefits they received and the value of the same benefits accompanied by the disclosure that PBC was scheming to move the Sonics at the end of the season. Plaintiffs failed to provide such evidence, however, even in the face of PBC's summary judgment motion. They offered no evidence to show that the pecuniary value of their tickets decreased as a result of PBC's deception. They offered no evidence to show that they encountered incidental expense or pecuniary harm as a result of that deception. *See, e.g.*, *Tallmadge v. Aurora Chrysler Plymouth, Inc.*, 605 P.2d 1275, 1278 (Wash. Ct. App. 1979) (holding that inconvenience of dealing with defective vehicle and deprivation of use and enjoyment of property were compensable CPA injuries); *Stephens*, 159 P.3d at 25 (holding that "time and expense" of investigating possible damage to credit rating was a CPA injury); *Sign-O-Lite Signs, Inc. v. DeLaurenti Florists, Inc.*, 825 P.2d 714, 720 (Wash. Ct. App. 1992) (holding that lost time, outside of litigation, spent dealing with dispute was a CPA injury). A CPA injury "does not have to be great, or even quantifiable," *Michael*, 165 P.3d at 48, "but it must be established" by evidence. *Mason*, 792 P.2d at 148. Despite the "especially broad" scope

ORDER – 28

of compensable injury under the CPA, *Stephens*, 159 P.3d at 25, Plaintiffs offer no evidence of an injury to their business or property resulting from PBC's deception.

For the reasons stated above, the court grants PBC's motion for summary judgment against Plaintiffs' CPA claim.  PBC has demonstrated not only that Plaintiffs have failed to create a genuine issue of material fact regarding damages, but that they have failed to create a genuine issue of material fact that Plaintiffs suffered a CPA injury. Despite strong evidence of PBC's intentional deception in marketing the Emerald Club offer, there is no evidence of a CPA injury flowing from that deception.

**D.      Class Certification Motions**

Plaintiffs ask the court to certify a class consisting of all Emerald Club members. Plaintiffs' original motions proposed a class and subclass, with different claims for each. They have now abandoned this proposal in favor of a single class.

Reviewing the parties' briefing, and considering the narrowed scope of Plaintiffs' claims in light of this order, the court is preliminarily inclined to certify a class defined as follows:

> All 2007 non-courtside Sonics season ticket holders who received the Emerald Club Brochure and complied with the renewal instructions therein, excluding the parties and their attorneys.

The court will consider appropriate modifications of this definition.  This class will pursue the contract claim that remains in this action.

The court concludes that this class, or its substantial equivalent, meets the four prerequisites for class certification stated in Fed. R. Civ. P. 23(a).  It contains more than 1200 members, and is therefore sufficiently numerous that joining all members individually would be impracticable.  Fed. R. Civ. P. 23(a)(1).  There are several common questions of law and fact, as the court has detailed in this order.  Fed. R. Civ. P. 23(a)(2).  As to the ability of the three Plaintiffs to serve as class representatives, the court is convinced that they have claims and defenses that are typical of other class

ORDER – 29

members.  Fed. R. Civ. P. 23(a)(3).  Finally, although the court is troubled by the extent to which outside interests (particularly the Save Our Sonics organization) were instrumental in the instigation of this lawsuit, the court finds that the three Plaintiffs can, going forward, fairly and adequately protect class members' interests.  Fed. R. Civ. P. 23(a)(4).

If this court is to certify this class, it must certify it under Rule 23(b)(3). Plaintiffs' assertion that this action is certifiable as a suit for injunctive relief under Rule 23(b)(2), to the extent that it ever had merit, is no longer valid in wake of the dismissal of Plaintiffs' prayer for injunctive relief.  Plaintiffs have had no opportunity to consider Rule 23(b)(3)'s requirements in the context of the portion of their claims that remain for adjudication.  The court will give them an opportunity to do so.  In particular, Plaintiffs must propose a specific plan for litigating the remainder of this action on a class-wide basis, including a plan for providing notice to class members, and a plan for obtaining information from class members regarding any individualized issues of law or fact that arise.  Plaintiffs must also propose a plan for trying this action.

Plaintiffs shall submit a supplemental brief in accordance with this order no later than March 13, 2009.  PBC shall respond no later than March 27, 2009.  The court will not consider a reply brief.

**E.  Motions to Seal**

Plaintiffs have filed two motions to seal documents (Dkt. ## 98, 106).  They filed both motions solely to comply with a confidentiality agreement between the parties.  As to the first motion, PBC responded by indicating that the court should seal the subject documents to protect private e-mail addresses of non-parties.  PBC provided copies of the subject documents redacted to eliminate the e-mail addresses (Dkt. # 103).  The court finds the redactions appropriate, and grants the motion to seal (Dkt. # 98) the unredacted documents (Dkt. # 100).  As to the second motion, PBC offered no response.  No party has stated any reason to seal the subject document, and the court therefore denies the

ORDER – 30

second motion to seal (Dkt. # 106) and directs the clerk to unseal the subject document (Dkt. # 109).

## IV.  CONCLUSION

For the reasons stated above, the court rules as follows.  The court GRANTS PBC's motion for summary judgment (Dkt. # 87) regarding Plaintiffs' CPA claim, and DENIES Plaintiffs' motion for summary judgment on the same claim (Dkt. # 125).  The court GRANTS PBC's motion for summary judgment (Dkt. # 122) as to Plaintiffs' prayer for specific performance or injunctive relief.  The court DENIES PBC's motion for summary judgment (Dkt. # 80) on contract damages, and GRANTS in part and DENIES in part Plaintiffs' motion for summary judgment (Dkt. # 126) on contract liability.  The court GRANTS Plaintiffs' first motion to seal (Dkt. # 98) and DENIES their second motion to seal (Dkt. # 106).

The net effect of these rulings is as follows.  Plaintiffs' CPA claim and prayer for injunctive relief are dismissed with prejudice, and the court will not consider class certification as to those claims.  Plaintiffs have established as a matter of law that they entered the Emerald Club Contract.  A jury must decide whether Plaintiffs waived their right to exercise their option to purchase 2009 season tickets, as well as the amount of damages flowing from PBC's breach of the option contract.

The clerk shall remove Plaintiffs' class certification motions (Dkt. ## 33, 41) from the court's calendar, and create a motion calendar entitled "Class Certification Motion" noted for March 27, 2009.  The parties shall submit briefing as stated in Part III.D.

DATED this 23rd day of February, 2009.

The Honorable Richard A. Jones
United States District Judge

ORDER – 31